**In re GRAND JURY SUBPOENAS DUCES TECUM, AUGUST 1986.**

Civ. No. N–86–2962.

United States District Court, District of Maryland.

March 20, 1987.

Gerald A. Feffer, James A. Bruton, III, Victoria L. Radd, Christopher B. Mead, John K. Villa, Williams & Connolly, Washington, D.C., for Movant.

Breckenridge L. Willcox, U.S. Atty., Robert N. McDonald, Asst. U.S. Atty., Baltimore, Md., for U.S.

## MEMORANDUM

NORTHROP, Senior District Judge.

On August 11, 1986, the Grand Jury impanelled in the District of Maryland issued four subpoenas *duces tecum* seeking the corporate records of two companies. The subpoenas were directed to:

1) "John Doe[1] or Custodian of Records B Corporation ("B Corp.");

2) "John Doe or Custodian of Records A Corporation" ("A Corp.");

3) "Richard Doe or Custodian of Records B Corporation; and

4) "Richard Doe or Custodian of Records A Corporation."

In response, John Doe and Richard Doe filed the presently pending motion to quash the subpoenas contending that: 1) the government is attempting to use the Maryland grand jury to prepare an already pending indictment for trial; 2) the materials being used by the Maryland grand jury were invalidly obtained through an interdistrict transfer absent a court order; and 3)

the act of production would violate the Does' Fifth Amendment privilege against compulsory self-incrimination.[2] In addition, John Doe also seeks leave to intervene to quash various subpoenas issued by the grand jury in this district to an accountant and other third-party witnesses.

After careful consideration of the pleadings submitted by the parties in this case, the Court finds that no hearing is necessary. Local Rule 6. For the reasons stated below, the Court finds the first two grounds advanced in support of quashing the subpoenas to be without merit. The subpoenas will be quashed, however, as to both John and Richard Doe on the basis of the Fifth Amendment privilege against self-incrimination. John Doe's motion to intervene will be denied.

The undisputed facts show that John Doe first learned of the government's interest in A Corporation and B Corporation in October 1984 when he was contacted by an IRS special agent serving as a member of a Department of Justice Strike Force in Cleveland, Ohio. As part of the Strike Force's criminal tax investigation of an individual named Reuben Sturman, the special agent sought to question Doe concerning any information he might have relating to Sturman's connections with various corporations.

Following this initial contact, Doe retained an attorney to represent him in the matter. In an affidavit, Doe's attorney stated that he contacted the special agent who then informed him that the Strike Force was interested in obtaining Doe's testimony before the Cleveland grand jury and that they would consider granting Doe immunity from prosecution in exchange for his testimony.

---

1. In the interest of preserving the secrecy of the ongoing grand jury investigation, this Court has granted the two subpoenaed individuals leave to proceed anonymously. They will, therefore, be identified by the pseudonyms John Doe and Richard Doe throughout the course of this opinion. The companies whose records have been requested will be referred to as B Corporation and A Corporation.

2. Richard Doe, an attorney, also raises an additional basis upon which the subpoenas may be challenged. Without conceding either the existence of, or his possession of the documents described in the subpoenas, he contends that the subpoenas seek documents protected by the attorney-client privilege. Doe, however, does not seek a ruling on the attorney-client issue at this time.

In mid-November 1984, the attorney met with the IRS special agent, two Strike Force attorneys and an IRS revenue agent Tom Ciehanski. According to Doe's attorney, the government participants told him that though Sturman was the target of their investigation, indictments had already been returned against individuals who had financial dealings with Sturman. The government officials advised the attorney that Doe had a close and long-standing financial relationship with Sturman and could therefore be prosecuted for conspiracy. The officials, however, expressed their interest in granting Doe immunity in return for testimony concerning Sturman's relationship with the following corporations: B Corporation; C Corporation; D Corporation; E Corporation and A Corporation. They mentioned that if John Doe's son, Richard Doe, had participated in transactions with any of these companies they would also ask for his cooperation.

Despite subsequent conversations with the government's attorneys, Doe's attorney was unable to reach an agreement with them regarding the requested proffer of immunity. On January 10, 1985, pursuant to federal grand jury subpoenas issued in Cleveland, John Doe, his wife and Richard Doe furnished the Strike Force with handwriting exemplars. Sometime thereafter the grand jury in the Northern District of Ohio handed down an indictment charging Sturman and various others with conspiracy to obstruct the IRS, tax evasion, tax perjury, obstruction of the grand jury process and violations of the laws requiring individuals to report their foreign bank accounts to the IRS. Neither the Does nor B

Corporation and A Corporation were included as defendants. The two corporations, however, were named, along with other individuals and entities, as payees of checks signed by Sturman under an alias.

The Does next contact with the government concerning their relationship to A Corporation and B Corporation came in August 1986 when a federal grand jury in the District of Maryland engaging in a related investigation, issued the four subpoenas in this case. The subpoenas were served upon Richard Doe by two IRS agents from Cleveland, one of whom was Tom Ciehanski, the IRS agent who had been present during the earlier meeting with Doe's attorney.

Both John and Richard Doe received subpoenas, issued in their names, commanding the production of all corporate records of A Corporation and B Corporation. Each subpoena was addressed, in the alternative, to the "Custodian of Records" of the respective corporation. In addition to calling for a wide variety of corporate workpapers and financial data,[3] the subpoenas specifically requested the production of any documents reflecting agreements between the two corporations and certain named individuals and entities including Reuben Sturman, John Doe, Richard Doe and E Corporation.[4]

Shortly after the issuance of the subpoenas to the Does, two individuals who had performed services on a recreational fishing boat owned by B Corporation were questioned concerning Sturman, John Doe and B Corporation. In an affidavit, the captain of a fishing boat owned by B Cor-

---

**3.** Each subpoena requested the production of 1) corporate ledgers and journals; 2) banking records; 3) loan records; 4) corporate minutes or other records of meetings; 5) financial statements; 6) copies of tax returns and workpapers used in their preparation; 7) corporate stock ledgers; 8) invoices and statements of accounts; 9) records connected with the acquisition or sale of real estate; 10) records connected with the corporation's ownership of personal property; 11) records relating to corporate construction loan agreements and mortgages; 12) personnel files of current and former employees and consultants; 14) travel and entertainment records and 15) records of commissions, rebates, discounts, bonuses, gifts and other pay-

ments made by the corporation to any individual or entity not an officer, director, or employee of the corporation.

**4.** Paragraph 16, the last request, commands the production of "[a]ll agreements, contracts, memoranda of understanding, and other such documents, reflecting or containing any agreement between the corporation on the one hand, and any of the following individuals or entities, or any entity of which any such individual is an owner, officer, director, manager, partner, or employee, on the other hand: John Doe, ..., Robert Doe, ..., Reuben Sturman and E Corporation."

poration, stated that on August 20, 1986, two IRS agents identifying themselves as being from Cleveland, Ohio asked him about the relationships between Sturman and B Corporation and John Doe and B Corporation. A second employee on the B Corporation boat also averred that she had been questioned by the IRS agents from Cleveland concerning Sturman and his connection to B Corporation. When both of these B Corporation employees refused to furnish formal statements without consulting an attorney, the agents procured subpoenas from the grand jury in Maryland in order to obtain their testimony. The grand jury also issued a subpoena to an accountant seeking documents related to services performed by his accounting firm for John Doe. The subpoena specifically called for any documents relating to B Corporation, A Corporation and D Corporation.

The Court first turns to the various challenges raised by the Does as to the propriety of the subpoenas directed to them.

## I. *The Motion to Quash*

### A. *Improper Use of Grand Jury*

The Does first argue that the government has abused the grand jury process by issuing the subpoenas of August 1986 for the purpose of gathering evidence to prepare for the pending trial of Reuben Sturman who was indicted by the Cleveland grand jury. In order to substantiate these charges, the Does request that the Court hold an evidentiary hearing into this matter.

In viewing the Does' allegations of impropriety, this Court must be guided by several generally recognized precepts regarding grand juries. Courts have accorded grand juries wide latitude to engage in their investigatory function and have generally refused to interfere in their proceedings "absent a compelling reason." *United States v. Moss*, 756 F.2d 329, 331 (4th Cir.1985); *In Re Grand Jury Subpoenas, April 1978*, 581 F.2d 1103, 1108 (4th Cir. 1978). Hence, grand jury proceedings have been accorded a presumption of regularity. *Moss*, 756 F.2d at 332; *United States v. Woods*, 544 F.2d 242, 250 (6th Cir.1976).

The burden of demonstrating an irregularity in such proceedings rests squarely upon the party alleging an impropriety. *Id.*

Though the grand jury is permitted great investigative freedom, this power is not unlimited. Courts have universally held that a prosecutor may not utilize the grand jury for the sole or primary purpose of gathering evidence for use in pending litigation. *Moss*, 756 F.2d at 332; *In Re Grand Jury Proceedings (Johanson)*, 632 F.2d 1033, 1041 (3rd Cir.1980); *Woods*, 544 F.2d at 250. Thus, "[o]nce a defendant has been indicted, the government is precluded from using the grand jury for the 'sole or dominant purpose of obtaining additional evidence against him.'" *Moss*, 756 F.2d at 332, quoting *United States v. (Under Seal)*, 714 F.2d 347, 350 (4th Cir.), *cert. dismissed*, 464 U.S. 978, 104 S.Ct. 1019, 78 L.Ed.2d 354 (1983).

In support of their claim of impropriety in this case, the Does contend that the identity of information sought by both the Ohio and Maryland grand juries, as well as the participation of IRS agents from Cleveland in the Maryland investigation, support the inference that the government's sole or dominant reason for issuing the contested subpoenas was to gather evidence for use against Sturman in his upcoming trial. They argue that since the government has failed to rebut this inference, by means such as the introduction of an affidavit attesting to the proper purpose of the investigation, an evidentiary hearing should be held in order to ascertain the government's true motives.

The Court finds, however, that a hearing would not be appropriate in this matter because the Does have failed to meet their burden of demonstrating any irregularity in the grand jury proceedings. Though the Does point to the similarity of information sought by the two grand juries, they have failed to produce any evidence suggesting that the government's primary purpose in obtaining this information is to strengthen its case against Sturman. While a grand jury is barred from using a supboena as a discovery device to

prepare for a pending trial, it remains free to elicit information which may lead to further indictments even where new evidence is also obtained against an already indicted person as a by-product of the investigation. *Moss*, 756 F.2d at 332; *(Johanson)*, 632 F.2d at 1041. Were it to be otherwise, the handing down of an indictment would foreclose the possibility of bringing related wrongdoers to trial or charging a defendant with newly discovered crimes.

The Fourth Circuit recently applied these principles in *United States v. Moss*, 756 F.2d at 329. In that case, the government indicted an automobile dealer and his corporation for conspiring to transport stolen automobiles. After these indictments were returned, the grand jury questioned two new witnesses concerning their involvement in the conspiracy with an eye towards the possible indictment of these witnesses as co-conspirators. Due to an insufficiency of evidence, indictments were not returned against the witnesses and they eventually testified for the government at the automobile dealer's trial.

Ruling on the propriety of this use of the witnesses' post-indictment testimony at trial, the Fourth Circuit found that, despite the similarity of information sought from the witnesses and the subject of the trial, the government's sole and dominant purpose in conducting the further investigation had not been to obtain evidence against the automobile dealer. To reach this conclusion, the Court relied upon an affidavit which set forth the government's good faith belief that the questioned individuals might have been subject to indictment.

In the case at bar, any need for a government affidavit on this issue is obviated by the Does' own admission that government officials participating in the original Ohio investigation had warned John Doe that he might be subject to indictment as Sturman's co-conspirator.[5] The fact that the grand jury in Ohio declined to proceed with its inquiry into the Does' alleged involvement in the conspiracy does not preclude the grand jury in Maryland, from continuing with the investigation.

The only other evidence of possible impropriety cited by the Does concerns the participation of Ohio IRS agents in the current investigation in Maryland. Though the Does suggest that a sinister purpose lies behind the employment of the same agents in both proceedings, absent a proffer of any substantiating facts, their contentions rise only to the level of mere suspicion. Since the movants have failed to carry their burden of demonstrating any irregularity in the grand jury proceedings, and the government is not required to submit rebuttal evidence. *See, Johanson*, 632 F.2d at 1041. Similarly, upon the facts presented, the Court finds no need to conduct an evidentiary hearing, with its attendant disruption of the grand jury process, into the government's motives in this case.

### B. *Propriety of Interdistrict Transfer of Grand Jury Materials Absent a Court Order*

Next, the Does contend that the close relationship between the subject matter investigated by both the Ohio and Maryland grand juries supports the inference that the grand jury in Ohio transferred materials to the Maryland grand jury without prior court approval. They argue that such an unsupervised disclosure constitutes an abuse of the grand jury proceedings in violation of Rule 6(e) of the Federal Rules of Criminal Procedure.

As stated above, the party alleging an impropriety in the grand jury process bears the burden of overcoming the presumption of regularity normally accorded to that body. *Moss*, 756 F.2d at 332. Beyond the speculative assertion advanced by the Does, this Court has not been presented with any evidence of an actual transfer of documents from one grand jury to another, either with or without court approval. Thus, the Court finds that the Does have

---

5. It should be noted that the government has expressed its willingness to furnish such an affi-  davit in this case should the Court so require.

failed to satisfy their burden of demonstrating any impropriety.[6]

The Does failure to meet their burden of proof is, however, of little consequence in this case, for the Court finds that an unsupervised transfer of materials between federal grand juries is expressly sanctioned by a 1983 amendment to the Federal Rules of Criminal Procedure. Rule 6(e)(3)(C)(iii) provides that, "[d]isclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made— ... (iii) when the disclosure is made by an attorney for the government to another federal grand jury; ...."

Though acknowledging the existence of rule 6(e)(3)(C)(iii), the Does argue that the provision was intended to authorize the intradistrict transfer of materials to successor grand juries only and does not permit interdistrict disclosures. In support of their interpretation, the Does argue that the 1983 amendment was meant to codify an existing practice which included a prohibition of intercircuit transfers without prior judicial approval.

Rule 6(e) codifies the " 'long-established policy that maintains the secrecy of the grand jury proceedings in the federal courts.' " *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 103 S.Ct. 3133, 3138, 77 L.Ed.2d 743 (1983), quoting, *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 681, 78 S.Ct. 983, 985–86, 2 L.Ed.2d 1077 (1958); *see also, United States v. Penrod*, 609 F.2d 1092, 1096 (4th Cir.1979). The rule contains a general prohibition against disclosure of matters occuring before the grand jury and sets forth certain exceptions to the non-disclosure rule, including paragraph (C)(iii).

According to the advisory committee notes pertaining to paragraph (C)(iii), the drafters considered the new exception "consistent with existing practice", since "[e]ven absent a specific provision to that effect, the courts have permitted such disclosure in some circumstances." *Amendment to Rules*, 97 F.R.D. 245, 260 (1983). The committee indicated its belief that a court supervised disclosure was unwarranted in the case of a transfer between two grand juries because "[i]n this kind of situation, '[s]ecrecy of grand jury materials should be protected almost as well by the safeguards at the second grand jury proceedings, including the oath of jurors, as by judicial supervision of the disclosure of such materials.'" *Amendments*, 97 F.R.D. at 269, quoting *United States v. Malatesta*, 583 F.2d 748 (5th Cir.1978).

Based upon these advisory committee notes, the Does argue that paragraph (C)(iii) was added to rule 6(e) for the sole purpose of legitimizing the existing practice of permitting intradistrict transfers between successor grand juries without a court order. The Court declines to adopt this interpretation of paragraph (C)(iii) for two reasons. First, the Does' analysis of prior court practice in the few cases dealing with the transfer of materials between grand juries is unduly restrictive. While some circuits have distinguished situations involving interdistrict transfers in the process of permitting intradistrict disclosures, *United States v. Garcia*, 420 F.2d 309, 311 (2nd Cir.1970), this distinction was not universally adopted.[7]

In *United States v. Penrod*, for example, the Fourth Circuit permitted an unapproved disclosure between grand juries located in two different states. There, the Court, found an interdistrict transfer ap-

---

**6.** The Does point to the government's failure to rebut their allegation of a transfer of materials as proof of the lack of court order in this case. To require the government to come forth with documentation to substantiate the propriety of the procedures used in this case, upon the mere assertion of an irregularity by the Does, would, in effect, shift the allocation of proof here and place an undue burden on the government.

**7.** The Does rely greatly on the case of *In Re Grand Jury Investigation of Banana Industry*, 214 F.Supp. 856 (D.Md.1963), as evidencing a pre-amendment practice of forbidding intercircuit transfers while permitting intracircuit disclosures. This case, however, simply does not support the distinction advanced by the Does. Though *Banana Industry* held that an interdistrict transfer of grand jury materials was impermissable absent court supervision, the court did not indicate that a proposed intradistrict transfer would be treated any differently. 214 F.Supp. at 858–59.

propriate in light of the close working relationship between two grand juries involved in an ongoing joint investigation. 609 F.2d at 1097. Given the existence of cases such as *Penrod* in which interdistrict as well as intradistrict disclosures were permitted, it is likely that the framers of paragraph (C)(iii) would have expressly distinguished between the two types of disclosure had they intended to authorize intradistrict transfers only.

Second, the plain wording of the rule itself supports the notion that it is to apply to both intradistrict and interdistrict exchanges. This interpretation of the amended rule is bolstered by the rationale advanced by the advisory committee in support of the change. While the Does contend that the amendment permits intradistrict transfers only because of the presence of continuing judicial supervision by the original court, the advisory committee notes expressly reject the need for such oversight when materials are delivered to a second grand jury. In this instance, secrecy is guarded not by the continuity of judicial protection, but "by the safeguards at the second grand jury proceedings, including the oath of jurors...." *Amendments,* 97 F.R.D. at 269. These safeguards are equally present whether the second grand jury lies within or without the original grand jury's district. Thus, the Court finds that rule 6(e)(3)(C)(iii) applies to both intradistrict and interdistrict transfers of grand jury materials.

### C. *Fifth Amendment Privilege and the Act of Production*

As a third ground for challenging the subpoenas in this case, the Does contend that they are entitled to claim the Fifth Amendment privilege against compulsory self-incrimination with respect to the act of producing the requested records.

The Supreme Court has held that the act of producing a document may be privileged under the Fifth Amendment even where the contents of the document are not similarly protected. *Fisher v. United States,* 425 U.S. 391, 411, 96 S.Ct. 1569, 1581, 48 L.Ed.2d 39 (1976); *United States v. Doe,* 465 U.S. 605, 104 S.Ct. 1237, 1242, 79 L.Ed.2d 552 (1984). The privilege against the compelled production of documents attaches if the act of producing subpoenaed records would be both testimonial and incriminating. *Id.*

█ Thus, in order to claim a Fifth Amendment privilege, the subpoenaed party must demonstrate that the act of producing the requested records would have a testimonial aspect and incriminating effect. In *Fisher,* the Supreme Court noted that, "[t]hese questions perhaps do not lend themselves to categorical answers; their resolution may instead depend on the facts and circumstances of particular cases or classes thereof." 96 S.Ct. at 1581.

The Supreme Court has identified various ways in which an act of production may be testimonial. Where the act of producing would implicitly require a subpoenaed individual to attest to the existence of certain records, his possession of them, or would serve to establish the documents' authenticity, the act may be considered testimonial. *Id.* at 1581–82; *Doe,* 104 S.Ct. at 1243, n. 13. If a subpoenaed party is able to demonstrate the testimonial nature of responding to a subpoena, the government may in turn rebut such a claim "by producing evidence that possession, existence, and authentication were a 'foregone conclusion.'" *Doe,* 104 S.Ct. at 1243, quoting *Fisher,* 96 S.Ct. at 1581. Finally, once the unrebutted testimonial nature of an act of production is established, the movant must further show that this compelled act would have an incriminatory effect. *Fisher,* 96 S.Ct. 1569.

Before addressing the question of whether each of the Does have been able to show that compliance with the subpoenas would involve testimonial self incrimination, the Court must first consider whether the Does may invoke act of production doctrine against the compelled production of business records.

It is a well settled Fifth Amendment jurisprudence that the privilege against compulsory self incrimination "is essentially a personal one, applying only to natural individuals." *United States v. White,* 322

U.S. 694, 698, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542 (1944). Thus, although an individual may claim the privilege, a collective entity "an organization which is recognized as an independent entity apart from its members", may not. *Bellis v. United States*, 417 U.S. 85, 88–89, 92, 94 S.Ct. 2179, 2182–2183, 2185, 40 L.Ed.2d 678 (1974).

Where business records are held in a personal rather than a representative capacity, the act of production doctrine may be invoked. *See, United States v. Doe*, 104 S.Ct. at 1242–43; *In Re Grand Jury Subpoena Duces Tecum*, 722 F.2d 981 (2d Cir. 1983). In addition, the Fourth Circuit recently held that when a subpoena for corporate records is addressed to an individual in his representative capacity, "[t]here will be rare occasions where an individual's production of those documents may amount to testimonial self-incrimination." *United States v. Lang*, 792 F.2d 1235, 1240–41 (4th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 574, 93 L.Ed.2d 578 (1986); *see also, In Re Two Grand Jury Subpoenas Duces Tecum*, 769 F.2d 52 (2d Cir.1985); *but see, In Re Grand Jury Subpoena (85–W–71–5)*, 784 F.2d 857, 861–62 (8th Cir.), *cert. granted, See v. United States*, —— U.S. ——, 107 S.Ct. 59, 93 L.Ed.2d 18 (1986) (individual could not claim privilege against act of production where corporate records held in a representative capacity.)[8]

The Fourth Circuit has stressed, however, that only in the rare and unusual case, will the production of documents held in a representative capacity lead to testimonial self-incrimination. *Lang*, 792 F.2d at 1240. In following the approach developed by the Second Circuit, the *Lang* court noted that, "[i]n the typical case, when an employee produces his company's records, he is not attesting to his personal possession of them, but to their existence and possession by the corporation." *Id.* citing *In Re Two Grand Jury Subpoenas Duces Tecum*, 769 F.2d 52, 57 (2d Cir.1985).

In the case at bar, the Does contend that the subpoenas are directed to them in their individual capacities. The government, on the other hand, asserts that the Does are asked to produce business records held in a representative capacity and must, therefore, demonstrate that they constitute one of the rare exceptions discussed in *Lang*.

■ At the outset, the Court notes that the phrasing of the subpoenas in this case has led to needless confusion. It is unclear from the documents themselves whether these are individual or custodial subpoenas. Each subpoena is directed in the disjunctive to either one of the Does or, alternatively, to the custodian of records of the corporation whose documents have been requested. Thus, the first part of each subpoena appears to request the production of documents held in a personal capacity, while the second part seems to be a subpoena addressed to that company's custodian. Nowhere, however, is either corporation directly subpoenaed. Where a subpoena imparts such an unclear direction, it must be construed against the drafter. Hence, the Court holds that these subpoenas require the Does to produce business records held by them in a personal capacity rather than a representative capacity. The Court must next consider whether either of the Does has met their burden of demonstrating that the act of producing the subpoenaed corporate records amounts to testimonial self-incrimination.

■ First, as to Richard Doe, the Court finds that the act of producing the documents of either B Corporation or A Corporation would have a testimonial aspect. By producing these records, Richard Doe would attest to his possession of the documents. The Second Circuit recognized the testimonial nature of a similar production request in *In Re Katz*, 623 F.2d 122 (2d Cir.1980). There, the court found that the forced production of the records of a business by appellant's attorney "would constitute a communication [by the attorney] ...

---

**8.** The Supreme Court granted certiorari in the Eighth Circuit case, *(85–W–71–5)*, 784 F.2d at 857, in apparent recognition of the conflict among the circuits as to the applicability of the act of production doctrine to a subpoenaed individual holding the records of a collective entity in a representative capacity.

to the effect that appellant, [his client], was connected with the corporations." 623 F.2d at 126.

In the case at bar, if Richard Doe were to produce the records of B Corporation and A Corporation, he would clearly link himself to the corporations. The government has not advanced any support for its contention that Doe's possession or control of these records is a foregone conclusion, beyond a bald allegation that Richard Doe has "served as an agent of the corporation." Absent any substantiating evidence, the Court finds that the government has not met its burden of showing that Doe's production would not add significantly to the store of the government's knowledge in this case.

The potentially incriminating nature of Richard Doe's act of production here is beyond dispute. While the government has not disclosed whether the Does are the actual targets of this investigation, the government has evidenced great interest in the connections between the Does and B Corporation and A Corporation presumably with the intent of possibly handing down indictments of individuals or entities who have had financial dealings with these corporations. Thus, the Court finds that the subpoenas directed to Richard Doe must be quashed.

■ The subpoenas addressed to John Doe present a slightly different case. For the same reasons discussed in relation to Richard Doe, John Doe's act of producing requested business records would be both testimonial and incriminating. The incriminating nature of admitting a connection with A Corporation or B Corporation is particularly apparent in John Doe's case since he had previously been threatened with the possibility of prosecution by the Ohio grand jury for related matters. The government, however, has presented evidence suggesting that John Doe's affiliation with the corporations and his possession of the documents is a foregone conclu-

sion. In support of this assertion, the government has presented the Court with copies of the 1984 tax return of B Corporation and the 1980 tax return of A Corporation, both of which are signed by John Doe. Each return identifies Doe as the corporation's "resident agent" and indicates that the corporation's books are "in care of" John Doe.

Though these returns indicate that the government did, at the time of the filings, know of Doe's probable possession of the corporations' documents, the government has failed to produce any evidence demonstrating their current awareness of John Doe's possession of the subpoenaed documents. Proof that, in 1984 and 1980, the government knew that John Doe was somehow involved with, and in possession of, the corporation's documents does not show that Doe either still possesses such documents or remains connected to either corporation. The act of producing these documents would force John Doe to satisfy the government's curiosity as to these two points, thus adding to the present state of the government's knowledge. Under the Fifth Amendment such potentially incriminating testimony cannot be exacted. The subpoenas directed to John Doe must be quashed.[9]

## II. *The Motion to Intervene*

■ John Doe seeks leave to intervene to quash other subpoenas issued by the Maryland grand jury in connection with the ongoing investigation that prompted the Does' subpoenas. Specifically, Doe claims that, under 24(a)(2) of the Federal Rules of Civil Procedure, he has a right to intervene and challenge the subpoena that has already been issued by this grand jury to an accountant and any other subpoena that may be issued to additional third parties.

If granted leave to intervene, Doe will urge that the subpoenas be quashed for the same two violations of grand jury proceedings he raised in respect to the subpoenas

---

9. Despite the quashing of these subpoenas, the government may still request that the Does be granted use immunity with respect to their act of production pursuant to Title 18 U.S.C. §§ 6002 and 6003. If such a request were granted the act of production here would no longer be privileged.

directed to him: 1) misuse of the investigative powers of the grand jury and 2) transfer of materials in violation of Rule 6(e). In light of this Court's holding above regarding the propriety of intercircuit transfers of grand jury materials under Rule 6(e), the Court need only consider Doe's right to intervene to raise the misuse of investigative powers issue.[10]

Rule 24(a)(2) provides that a party may intervene of right "when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

In this case, Doe claims an interest in preventing alleged misuse of the investigation powers of the grand jury. As described above, he contends that the government has sought the issuance of the subpoenas here for the sole or dominant purpose of obtaining evidence for use against an already indicted person, Reuben Sturman.

The Supreme Court has held that a movant must demonstrate he has "a significantly protectable interest" in a matter in order to establish a right to intervene. *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 542, 27 L.Ed.2d 580 (1971). While a claim of abuse of process may amount to a significantly protectable interest in appropriate circumstances, *see Donaldson*, 91 S.Ct. at 542; *United States v. Darwin Construction Co., Inc.*, 632 F.Supp. 1426, 1428 (D.Md.1986), such a situation is not presented here.

Doe alleges that the government is improperly obtaining evidence to use against Sturman in an upcoming trial. Sturman himself would obviously have a very personal, protectable interest in preventing this abuse. Similarly, the subpoenaed party would be so intimately affected as to

have standing to raise this issue. Other parties such as Doe, however, have only a general interest, shared by other members of society, in wishing to curb abuses of the grand jury process. Under 24(a)(2), such concern does not rise to the level of interest necessary to trigger intervention of right.

Even were such an interest found to be present in this case, the Court notes that Doe has failed to meet his minimal burden of establishing that this interest would not be adequately represented by the subpoenaed party. See, *Newport News, etc. v. Peninsula Shipbuilders*, 646 F.2d 117, 122 (4th Cir.1981).

For these reasons, Doe's motion to intervene will be denied.

## ORDER

In order to maintain the secrecy of the proceedings in this sealed matter, and in consideration of the Court's intention to publish the substance of the memorandum attached to this Court's Order of March 20, 1987, IT IS this 29th day of April, 1987, by the United States District Court for the District of Maryland, ORDERED:

1. That the foregoing memorandum, in which minor changes have been made to preserve the anonymity of the subpoenaed parties, supercedes and replaces the memorandum attached to this Court's Order of March 20, 1987;

2. That the issuance of this superceding opinion does not change or amend the effect or timetable established in this Court's Order of March 20, 1987;

3. That copies of this Order and the foregoing superseding memorandum be mailed to counsel in the case.

---

**10.** While the Does were unable to make the requisite showing of an irregularity in the grand jury proceedings in relation to the subpoenas served upon them, this does not preclude the possibility that another subpoenaed individual might possibly produce evidence demonstrating such abuse.